**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| GEODYNAMICS, INCORPORATED,<br><br>*Plaintiff,*<br><br>v.<br><br>DYNAENERGETICS US, INC.,<br><br>*Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No. 2:16-CV-697-RSP<br><br>**JURY TRIAL DEMANDED** |
| DYNAENERGETICS US, INC.,<br><br>*Counterclaim Plaintiff,*<br><br>v.<br><br>GEODYNAMICS, INCORPORATED,<br><br>*Counterclaim Defendant.* | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |

**AMENDED ANSWER AND COUNTERCLAIM OF DYNAENERGETICS US, INC. TO PLAINTIFF'S COMPLAINT FOR PATENT INFRINGEMENT**

Defendant and Counterclaim Plaintiff DynaEnergetics US, Inc. ("DynaEnergetics") by and through counsel, hereby responds to the numbered paragraphs of Plaintiff GEODynamics, Inc.'s ("Plaintiff") Complaint For Patent Infringement ("Complaint") as follows:

**Nature of the Action**

1. DynaEnergetics admits that it has sold in the United States its DPEX® shaped charges, which have been manufactured in Blum, Texas and/or in Germany. DynaEnergetics admits that the USPTO issued U.S. Patent No. 9,080,431 to GEODynamics but denies that the patent was properly issued and denies that it covers any groundbreaking inventions, and notes that

this patent has not been asserted in this action. DynaEnergetics admits that the title of the U.S. Patent No. 8,544,563 ("the '563 patent") is "Oil Well Perforators" but denies infringement of any valid claim of the '563 patent. DynaEnergetics denies that its DPEX shaped charges were developed "[w]ithout making the same investment in research and development." DynaEnergetics denies that it "knew of the '563 patent and its infringing activities for at least several years." DynaEnergetics lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations of Paragraph 1, and therefore denies the same.

**Parties**

2. DynaEnergetics lacks knowledge or information sufficient to form a belief about the truth of the allegations in Paragraph 2, and therefore denies the same.

3. DynaEnergetics admits that it is a corporation organized under the laws of the State of Colorado, and denies the remaining allegations in Paragraph 3.

**Jurisdiction and Venue**

4. DynaEnergetics admits that Plaintiff alleges a violation of the federal patent laws, Title 35 of the United States Code but denies that the action has merit. DynaEnergetics does not contest subject matter jurisdiction.

5. DynaEnergetics admits that it has distribution facilities in Texas, and that the Court has personal jurisdiction over DynaEnergetics. DynaEnergetics does not contest venue in this District. DynaEnergetics denies the remaining allegations of Paragraph 5.

**Count 1: Infringement of '563 Patent**

6. DynaEnergetics admits that a copy of the '563 patent is attached as Exhibit A to Plaintiff's Complaint. DynaEnergetics admits that on its face the '563 patent is entitled "Oil Well

Perforators" and indicates an issuance date of October 1, 2013. DynaEnergetics admits that on its face the '563 patent lists QinetiQ Ltd. as its assignee. DynaEnergetics denies that the '563 patent was duly and legally issued. DynaEnergetics lacks knowledge or information sufficient to form a belief about the truth of the remaining allegations in Paragraph 6, and therefore denies the same.

7. DynaEnergetics denies the allegations of Paragraph 7.

8. DynaEnergetics admits that Claim 1 of the '563 patent is accurately recited. The remaining allegations in Paragraph 8 consist of legal conclusions, and, therefore, no response is required. To the extent that a response is required, DynaEnergetics denies that it infringes, induces infringement, or contributes to infringement of any claim of the '563 patent, and denies the remaining allegations in Paragraph 8.

9. The allegations in Paragraph 9 consist of legal conclusions, and, therefore, no response is required. To the extent that a response is required, DynaEnergetics denies that it infringes any claim of the '563 patent and denies the remaining allegations in Paragraph 9.

10. The allegations in Paragraph 10 consist of legal conclusions, and, therefore, no response is required. To the extent that a response is required, DynaEnergetics denies that it has infringed or willfully infringed any claim of the '563 patent and denies the remaining allegations in Paragraph 10.

**Prayer**

DynaEnergetics denies that Plaintiff is entitled to any relief whatsoever, let alone the relief requested by Plaintiff in the Complaint, and therefore denies all allegations and relief requested in Plaintiff's Prayer for Relief.

## GENERAL DENIAL

DynaEnergetics further denies each and every allegation in Plaintiff's Complaint that is not specifically admitted, denied, or otherwise responded to in this Answer.

## DEFENSES

DynaEnergetics hereby asserts the following defenses to the Complaint:

### FIRST DEFENSE
### (Failure to State a Claim)

Plaintiff fails to state a claim on which relief can be granted.

### SECOND DEFENSE
### (Lack of Standing)

Plaintiff lacks standing or capacity, or both, to bring some or all of the claims alleged.

### THIRD DEFENSE
### (Non-Infringement)

DynaEnergetics is not infringing and has not infringed, either literally or under the doctrine of equivalents, directly, by inducement, contributorily, or in any other way, any valid or enforceable claim of the '563 patent.

### FOURTH DEFENSE
### (Invalidity)

The claims of the '563 patent are invalid for failure to comply with one or more of the requirements of U.S. Patent Law, including but not limited to 35 U.S.C. §§ 101, 102, 103, and 112.

### FIFTH DEFENSE
### (Limitation of Claim Scope)

The prior art known before the alleged invention covered by the '563 patent limits and restricts the scope of the patent claims such that DynaEnergetics does not infringe any valid or enforceable claim of the '563 patent.

**SIXTH DEFENSE**
**(Prosecution History Estoppel)**

Plaintiff's claims for relief for patent infringement are barred, in whole or in part, by the doctrine of prosecution history estoppel. Plaintiff is estopped from asserting or obtaining any construction of the claims of the '563 patent that would result in any of the claims covering any product of DynaEnergetics.

**SEVENTH DEFENSE**
**(Failure to Mitigate Damages)**

Plaintiff's claims for relief for patent infringement are barred, in whole or in part, because Plaintiff has failed to mitigate its potential damages.

**EIGTH DEFENSE**
**(No Entitlement to Injunctive Relief)**

Plaintiff is not entitled to any injunctive relief because any alleged injury to Plaintiff is not immediate or irreparable, and Plaintiff has an adequate remedy at law.

**NINTH DEFENSE**
**(Failure to Mark)**

To the extent that Plaintiff failed to comply with any applicable provisions of 35 U.S.C. § 287, Plaintiff's claims arising from the alleged infringement of the '563 patent are limited under § 287.

**TENTH DEFENSE**
**(Patent Misuse)**

As set forth in detail in DynaEnergetics' Counterclaim, which is incorporated herein by reference, the claims of the '563 patent are unenforceable due to patent misuse. Plaintiff has engaged in patent misuse by impermissibly broadening the scope of the '563 patent with anticompetitive effect by, *inter alia*, making objectively baseless claims of infringement against competitors' products, including those of DynaEnergetics, that do not infringe any claim of the

'563 patent; and attempting to enforce the '563 patent against competitors, including DynaEnergetics, when Plaintiff is aware that the '563 patent is invalid; all in an attempt to directly interfere with the business relationships of competitors, including DynaEnergetics. Further, upon information and belief, Plaintiff made allegations of infringement before the '563 patent issued, and also made allegations of infringement in geographical locations where neither Plaintiff nor the original assignee, QinetiQ, held any applicable patent rights.

**ELEVENTH DEFENSE**
**(Unclean Hands)**

Plaintiff's claims for relief are barred by the doctrine of unclean hands.

**TWELFTH DEFENSE**
**(Inequitable Conduct)**

As set forth in detail in DynaEnergetics' Counterclaim, which is incorporated herein by reference, the claims of the '563 patent are unenforceable due to inequitable conduct committed during the prosecution of the '563 patent before the USPTO.

**RESERVATION OF ADDITIONAL DEFENSES**

DynaEnergetics reserves the right to assert, and hereby gives notice that it intends to rely on, any other defenses that may become available or appear during discovery proceedings or otherwise in this case and hereby reserves the right to amend its Answer and Counterclaim of DynaEnergetics US, Inc. to assert any such defense.

## COUNTERCLAIM

Defendant and Counterclaim Plaintiff DynaEnergetics US, Inc. ("DynaEnergetics"), hereby submits its Counterclaim against Plaintiff and Counterclaim Defendant GEODynamics, Inc. ("Counterclaim Defendant"), as follows:

1. DynaEnergetics is an innovator and market-leader in the field of detonators, detonating cords, and explosives. In the 150 years since its founder, Alfred Nobel, invented dynamite, DynaEnergetics has provided effective and creative solutions to the oilfield industry by creating the most advanced and comprehensive perforating and well completion systems worldwide. DynaEnergetics has invested substantial time, resources, and manpower to developing its own proprietary systems to ensure the quality and reliability of those systems for its customers in the industry.

### THE PARTIES

2. DynaEnergetics is a corporation organized and existing under the laws of the State of Colorado, having a principal place of business in Houston, Texas.

3. In its Complaint, Counterclaim Defendant purports to be a corporation organized and existing under the laws of the State of Delaware, with a principal office located in Millsap, Texas.

### JURISDICTION AND VENUE

4. DynaEnergetics counterclaims against Counterclaim Defendant pursuant to the patent laws of the United States, Title 35 of the United States Code and the laws authorizing actions for declaratory judgment in the courts of the United States, 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 13.

5. The Court has jurisdiction over DynaEnergetics' counterclaims pursuant to 28

U.S.C. §§ 1331, 1338(a), 2201(a), and 2202.

6. This Court has personal jurisdiction over Counterclaim Defendant by virtue of, *inter alia*, its filing of the Complaint against DynaEnergetics in this district. Counterclaim Defendant has consented to venue in this district by filing this action. Accordingly, venue is proper pursuant to 28 U.S.C. §§ 1391 and 1400.

7. Counterclaim Defendant has sued DynaEnergetics for infringement of U.S. Patent No. 8,544,563 ("the '563 patent").

8. An actual and justiciable controversy exists between DynaEnergetics and Counterclaim Defendant, by virtue of the averments in Counterclaim Defendant's Complaint and DynaEnergetics' Answer, as to whether the claims of the '563 patent are invalid, unenforceable, and/or not infringed by DynaEnergetics.

**FIRST COUNTERCLAIM**
**Declaratory Judgment of Non-Infringement of the '563 Patent**

9. DynaEnergetics repeats and incorporates by reference each of the averments of paragraphs 1 through 8 of these Counterclaims.

10. Counterclaim Defendant claims to be the exclusive owner of all rights, title and interest in the '563 patent.

11. Counterclaim Defendant in this action avers that DynaEnergetics infringes, directly and indirectly, one or more claims of the '563 patent.

12. DynaEnergetics is not infringing, has not infringed, and is not liable for any infringement, directly or indirectly, of any valid claim of the '563 patent, and Counterclaim Defendant is entitled to no relief for any such claim of infringement against DynaEnergetics.

13. Absent a declaration of non-infringement of the ‘563 patent, Counterclaim Defendant will continue to assert the ‘563 patent against DynaEnergetics and will in this way cause damage to DynaEnergetics.

14. Accordingly, there is an actual case or controversy over DynaEnergetics’ non-infringement of the ‘563 patent and DynaEnergetics seeks a judgment holding that it has not infringed, does not infringe and is not liable for any infringement of the ‘563 patent.

**SECOND COUNTERCLAIM**
**Declaratory Judgment of Invalidity of the ‘563 Patent**

15. DynaEnergetics repeats and incorporates by reference each of the allegations of paragraphs 1 through 14 of these Counterclaims.

16. Counterclaim Defendant claims to be the exclusive owner of all rights, title and interest in the ‘563 patent.

17. The Complaint alleges that DynaEnergetics infringes the ‘563 patent.

18. The claims of the ‘563 patent are invalid for failure to meet one or more of the conditions for patentability specified in Title 35 of the United States Code, or the rules, regulations, and laws related thereto. Specifically, the claims of the ‘563 patent are invalid at least for claiming unpatentable subject matter under 35 U.S.C. § 101, for being anticipated under 35 U.S.C. § 102, for being obvious under 35 U.S.C. § 103, and/or failure to comply with the written description, enablement, and/or definiteness requirements of 35 U.S.C. § 112.

19. Absent a declaration of invalidity of the ‘563 patent, Counterclaim Defendant will continue to assert the ‘563 patent against DynaEnergetics and will in this way cause damage to DynaEnergetics.

20. Accordingly, there is an actual case or controversy concerning the validity of the ‘563 patent and DynaEnergetics seeks a judgment holding that all asserted claims of the ‘563 patent are invalid.

**THIRD COUNTERCLAIM**
**Declaratory Judgment of Unenforceability of the ‘563 Patent – Patent Misuse**

21. DynaEnergetics repeats and incorporates by reference each of the allegations of paragraphs 1 through 20 of these Counterclaims.

22. There is an actual and justiciable controversy between DynaEnergetics and Counterclaim Defendant regarding whether the ‘563 patent is unenforceable due to patent misuse.

23. Counterclaim Defendant has engaged in patent misuse by filing and maintaining this action, in bad faith, when it knew or should have known that the ‘563 patent is invalid and/or that DynaEnergetics has not infringed any valid claim of the ‘563 patent.

24. Counterclaim Defendant could not reasonably expect to succeed on the merits of its case based on a claim that DynaEnergetics infringes the ‘563 patent.

25. Upon information and belief, Counterclaim Defendant brought this action for improper motives, including for the purposes of interfering with DynaEnergetics’ customer relationships.

26. Upon information and belief, Counterclaim Defendant made allegations of infringement of the ‘563 patent before the patent issued, and further made allegations of infringement in geographical locations where it knew neither Counterclaim Defendant nor the original assignee, QinetiQ, had any applicable patent rights.

27. Through these improper acts, among other conduct, Counterclaim Defendant has impermissibly attempted to broaden the scope of the ‘563 patent and committed patent misuse.

28. Accordingly, DynaEnergetics is entitled to a judgment declaring that the claims of the '563 patent are unenforceable due to patent misuse.

**FOURTH COUNTERCLAIM**
**Declaratory Judgment of Unenforceability of the '563 Patent – Inequitable Conduct**

29. DynaEnergetics repeats and incorporates by reference each of the allegations of paragraphs 1 through 28 of these Counterclaims.

30. The '563 patent issued from an application submitted to the USPTO for examination on September 14, 2009. Initially, draft claim 42, which later issued as claim 1 in the '563 patent, required a "further metal … present in an amount greater than 10% w/w the liner."

31. On March 1, 2012, the examiner rejected all of the draft forms of the asserted claims as obvious in light of a published international patent application WO 2005/035939 ("Bates" or the "Bates reference"), finding that Bates discloses a reactive oil and gas perforator liner comprising a reactive composition of at least two metals that are capable of an exothermic reaction and at least one further metal that is not capable of an exothermic reaction with the two reactive metals.

32. On June 20, 2012, the applicants amended draft claim 42 to state that the "further metal is present in an amount greater than 40% w/w the liner."

33. The applicants also amended claim 80, which would later appear as claim 34 in the '563 patent, to include a limitation for a particular metal being present "in an amount greater than 40% w/w the liner."

34. With these amendments, the language of the asserted claims was finalized except for minor later changes relating to the renumbering of the claims.

35. Along with these amendments, the applicants presented arguments for patentablity. The applicants acknowledged that Bates discloses the use of at least one "further metal."

36. The applicants argued, however, that the requirement for a "further metal" in an amount greater than 40% distinguished the claimed invention from Bates because it was "totally unexpected" that at high inert metal inclusions the tunnel would remain debris free.

37. On June 28, 2012, the examiner again rejected all of the asserted claims as obvious in light of Bates, finding the applicants' contrary arguments unpersuasive. The examiner stated that the applicants' arguments of "unexpected results" must be established by evidence and not simple argument or conclusory statements in the specification.

38. On December 19, 2012, the applicants responded, stating that Bates teaches reactive liners, and that based on Bates the skilled person would not consider testing liners which comprise relatively low amounts of reactive materials compared to the further metal inclusion.

39. The applicants asserted that Bates "teaches away" from further metal inclusions in excess of 40%.

40. The applicants also stated that the data provided in the originally filed specification provide sufficient basis for demonstrating that the use of "further metals" above 40% provided surprising results.

41. On January 24, 2013, the examiner again rejected the asserted claims as obvious in light of Bates. The examiner noted that Bates does not limit the amount of "further metal" to an amount less than 40% w/w of the liner.

42. On July 23, 2013, the applicants agreed with the examiner that Bates discloses introducing a further metal to increase penetrative power.

43. The applicants argued, however, that Bates taught only a relatively minor further metal inclusion.

44. The applicants also argued again that Bates teaches away from liners having a high proportion of inert further metal.

45. To support their argument that Bates did not teach high levels of "further metals" and that the use of at least 40% further metal produced "unexpected" improvements, the applicants pointed to experiments with specific embodiments of the alleged invention described in the specification of the application, including a chart.

46. The chart as it appears in the '563 patent is reproduced below:

TABLE 1

showing percentage inclusion of tungsten and tunnel profile.

| Powder Composition (weight) | Shot no. | % tungsten | Core Entrance hole diameter | CT Clear Tunnel | % CT | TCP Total Core Penetration |
|---|---|---|---|---|---|---|
| 21% Ni, 9% Al | 19, 20 | 70% W | 1.01 | 12.50 | 98% | 12.75 |
| 41% Ni, 19% Al | 16, 17 | 40% W | 1.20 | 9.21 | 96% | 9.55 |
| 62% Ni, 28% Al | 15 | 10% W | 1.22 | 8.75 | 98% | 8.90 |
| 68.5% Ni, 31.5% Al | 13 | 0% W | 1.27 | 5.35 | 100% | 5.35 |
| 68.5% Ni, 31.5% Al | 7, 8 | 0% W | 1.82 | 6.91 | 92% | 7.50 |
| 68.5% Ni, 31.5% Al | 5, 6 | 0% W | 1.30 | 7.89 | 100% | 7.89 |
| Cu, Pb, W Baseline | 1, 2, 4 | 0% W | 0.55 | 9.59 | 78% | 12.38 |

47. This chart shows different chemical compositions for different "shot" numbers.

48. On August 7, 2013, the examiner issued a notice of allowance for the '563 patent.

49. The Bates reference is an international patent application and formed the basis for a U.S. application that ultimately issued as U.S. Patent No. 8,220,394 ("the '394 patent").

50. The Bates reference provides the same technical disclosure as the specification of the '394 patent.

51. In the prosecution of the '394 patent, the applicants encountered multiple rejections in light of the prior art.

52. On August 8, 2011, the examiner issued a fifth rejection of the application that ultimately produced the ‘394 patent.

53. In response, the applicants submitted on February 8, 2012, a declaration of Philip Duncan Church (the “Church declaration”) regarding experiments using embodiments of the alleged invention. The applicants also submitted arguments based on the Church declaration.

54. On information and belief, Mr. Church performed or observed the experiments he described in his declaration.

55. These experiments involved multiple “shots” with liners composed of different compositions. A chart showing the chemical compositions and “shot” numbers from the Church declaration is reproduced below:

| **Design** | **Berea Shots (REAL no)** | **Powder Composition (by weight)** |
|---|---|---|
| Iteration 6 | 19, 20 | 21%Ni, 9%Al, 70%W |
| Iteration 5 | 18 | 21%Ni, 9%Al, 70%W |
| Iteration 4 | 17 | 41%Ni, 19%Al, 40%W |
| Iteration 3 | 15 | 62%Ni, 28%Al, 10%W |
| Iteration 2 | 13 | 68.5%Ni, 31.5%Al (**) |
| Iteration 1 | 08 | 68.5%Ni, 31.5%Al (*) |
| Iteration 0 | 06 | 68.5%Ni, 31.5%Al |
| Baseline | 04 | Cu, Pb, W |

56. “Shot” numbers thus appear in both the Church declaration and the ‘563 patent.

57. Moreover, for each “shot” number, the experiments described by Mr. Church and the experiments described in the specification of the ‘563 patent involved reactive liners with identical chemical compositions.

58. For example, in both the Church declaration and the specification for the ‘563 patent, shots 19 and 20 used liners that were 21% nickel, 9% aluminum, and 70% tungsten.

59. In his declaration, Mr. Church also described flow tests. In these tests, the only reactive liners that were tested were 70% tungsten.

60. The applicants for the ‘394 patent argued that flow tests supported the patentability of draft claim 47, which required “at least one further inert metal … not capable of an exothermic reaction” with two other metals in a liner.

61. The applicants described draft claim 47 as being directed to one embodiment of the invention described in the specification of the ‘394 patent.

62. Like the applicants in the ‘563 patent, the applicants for the ‘394 patent argued not only that high tungsten liners were successful but also that this success was unexpected in light of the prior art.

63. Regarding the flow tests on 70% tungsten liners, the applicants for the ‘394 patent stated that the improved flow from liners with 70% tungsten was surprising because the presence of the further metal reduces the amount of reactive material compared with a shaped charge of the same size.

64. Mr. Church asserted that increasing percentages of tungsten showed a steady progression of penetration improvements.

65. On information and belief, the experiments described by Mr. Church in his declaration submitted in the prosecution of the ‘394 patent are the same experiments described in the specification of the ‘563 patent.

66. Brian Bourne is listed as an inventor on the ‘563 patent, the Bates reference, and the ‘394 patent.

67. In the prosecution of the ‘563 patent and the ‘394 patent, Bourne made grossly inconsistent statements regarding the technical teachings of the Bates reference.

68. In February 2012, Bourne asserted to one examiner that the alleged invention described in the ‘394 patent, which was based on the Bates reference, included liners that are 21% nickel, 9% aluminum, and 70% tungsten, but less than a year later during the prosecution of the ‘563 patent Bourne asserted that the Bates reference not only did not disclose liners that were 70% tungsten but also “taught away” from liners that were more than 40% tungsten.

69. Given that the examiner had already rejected the application that led to the ‘563 patent three times in light of Bates, Bourne’s inconsistent statements regarding the teachings of Bates, which are the same as those of the ‘394 patent, resulted in the issuance of the ‘563 patent, which otherwise would not have issued.

70. Bourne made these statements regarding the teachings of the Bates reference with the intent to convince one examiner to issue the ‘394 patent and another examiner to issue the ‘563 patent.

71. Bourne made these statements regarding the teachings of Bates and the ‘394 patent with the intent to defraud the USPTO.

72. Bourne also made grossly inconsistent statements regarding the experiments that are described in the ‘563 patent and in the Church declaration.

73. Specifically, Bourne asserted to one examiner that those experiments showed “unexpected results” that supported the issuance of the ‘394 patent, which was based on the Bates reference, while during the later prosecution of the ‘563 patent, Bourne contended that those experiments showed “unexpected results” in light of the Bates reference.

74. Given that the examiner had already rejected the application that led to the '563 patent three times in light of Bates, Bourne's inconsistent statements regarding the experiments that are described in the '563 patent and in the Church declaration resulted in the issuance of the '563 patent, which otherwise would not have issued.

75. Bourne made these statements regarding the experiments that are described in the '563 patent and in the Church declaration with the intent to convince one examiner to issue the '394 patent and another examiner to issue the '563 patent.

76. Bourne made these statements regarding the experiments that are described in the '563 patent and in the Church declaration with the intent to defraud the USPTO.

77. In the prosecution of the '563 patent, Bourne did not disclose any of his statements made during the prosecution of the '394 patent regarding the Church declaration, nor did Bourne disclose the Church declaration itself.

78. Given that the examiner had already rejected the application that led to the '563 patent three times in light of Bates, Bourne's decision to disclose neither his arguments regarding the Church declaration nor the declaration itself resulted in the issuance of the '563 patent, which otherwise would not have issued.

79. Bourne withheld these statements and the Church declaration with the intent to convince one examiner to issue the '394 patent and another examiner to issue the '563 patent.

80. Bourne withheld these statements and the Church declaration with the intent to defraud the USPTO.

81. Accordingly, DynaEnergetics is entitled to a judgment declaring that the claims of the '563 patent are unenforceable due to inequitable conduct.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, DynaEnergetics demands a trial by jury of all issues from this Answer and Counterclaim that are triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, DynaEnergetics prays as follows:

A. That Plaintiff takes nothing by way of its Complaint;

B. That Plaintiff's request for injunctive relief and any and all damages, including treble damages, be denied;

C. That the Complaint be dismissed with prejudice and judgment be entered in favor of DynaEnergetics as to all claims;

D. That the Court enter a judgment declaring that DynaEnergetics has not and does not infringe and is not liable for any infringement of any valid and enforceable claim of the '563 patent;

E. That the Court enter a judgment declaring that the '563 patent is invalid;

F. That the Court enter a judgment declaring that the '563 patent is unenforceable due to patent misuse;

G. That the Court enter a judgment declaring that the '563 patent is unenforceable due to inequitable conduct;

H. That the Court find that this case is exceptional and that DynaEnergetics is entitled to an award of attorneys' fees under 28 U.S.C. § 285;

I. That the Court award DynaEnergetics the costs of this suit; and

J. For any other relief that the court deems just and proper.

Dated: March 16, 2017

Respectfully submitted,

By: /s/ Eric H. Findlay
Eric H. Findlay
Texas Bar No. 00789886
Walter W. Lackey, Jr.
Texas Bar No. 24050901
Findlay Craft P.C.
102 N. College Avenue, Suite 900
Tyler, TX 83402
Telephone: (903) 534-1100
Facsimile: (903) 534-1137
Email: efindlay@findlaycraft.com
Email: wlackey@findlaycraft.com

Barry J. Herman (*pro hac vice*)
Womble Carlyle Sandridge & Rice, LLP
100 Light Street, 26th Floor
Baltimore, MD 21202
Telephone: (410) 545-5830
Email: bherman@wcsr.com

Preston H. Heard (*pro hac vice*)
Womble Carlyle Sandridge & Rice, LLP
271 17th Street, NW, Suite 2400
Atlanta, GA 30363
Telephone: (404) 888-7366
Email: pheard@wcsr.com

Michael F. Nullet (*pro hac vice*)
Womble Carlyle Sandridge & Rice, LLP
1200 Nineteenth Street, N.W. Suite 500
Washington, DC 20036
Telephone: (202) 857-4451
Email: mnullet@wcsr.com

Lisa J. Moyles (*pro hac vice*)
Moyles & Tremblay Law, LLC
970 Beaver Dam Road
Stratford, CT 06614
Telephone: (203) 258-6675
Email: lmoyles@mtlaw.us

*Counsel for Defendant and Counterclaim Plaintiff DynaEnergetics US, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served this 16th day of March, 2017, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).

*/s/ Eric H. Findlay*
Eric H. Findlay